*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SPECTRUM HEALTH HOSPITALS,

Plaintiff-Appellee,

v

FARM BUREAU MUTUAL INSURANCE
COMPANY OF MICHIGAN,

Defendant,

and

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

Defendant-Appellant.

FOR PUBLICATION
September 3, 2020
9:05 a.m.

No. 347553
Kent Circuit Court
LC No. 17-007661-NF

SPECTRUM HEALTH HOSPITALS,

Plaintiff-Appellant,

v

FARM BUREAU MUTUAL INSURANCE
COMPANY OF MICHIGAN,

Defendant,

and

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

Defendant-Appellee.

No. 348440
Kent Circuit Court
LC No. 17-007661-NF

-1-

Before: TUKEL, P.J., and MARKEY and GADOLA, JJ.

MARKEY, J.

In this dispute involving personal protection insurance (PIP) benefits under the no-fault act, MCL 500.3101 *et seq.*, defendant Farm Bureau General Insurance Company paid 80% of the charges billed by plaintiff Spectrum Health Hospitals but refused to pay the full amount on the basis that charges exceeding 80% of the total amount billed were "unreasonable." Spectrum filed suit, seeking payment of the balance. The trial court denied Farm Bureau's motion in limine regarding, primarily, the relevance of evidence pertaining to payments by third-party payers such as health insurers, Medicare, and Medicaid, concluding categorically that this evidence was not pertinent to the question whether Spectrum's charges were reasonable within the meaning of the no-fault act. Thereafter, the parties entered into a consent judgment, preserving Farm Bureau's right to challenge the trial court's ruling on its motion in limine. Subsequently, the trial court entered an order denying Spectrum's request for attorney fees under the attorney-fee penalty provision of the no-fault act, MCL 500.3148. In Docket No. 347553, Farm Bureau appeals by right, challenging the trial court's earlier decision on the motion in limine. In Docket No. 348440, Spectrum appeals by right the denial of its request for attorney fees. The appeals have been consolidated by this Court.[1] We reverse in Docket No. 347553, which also requires us to reverse in Docket No. 348440, and remand for further proceedings.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

On August 22, 2016, Brett Sabby suffered bodily injuries in a motor vehicle accident that occurred when the car in which he was a passenger left the road and struck a tree. As a result of the accident, Sabby received medical care and treatment at Spectrum. Many of the medical records available to us on appeal have been heavily redacted. But from the available information, it appears that, among other injuries, Sabby suffered a femur fracture, a complex open ankle fracture, broken ribs, a knee laceration, and a "Roy-Camille type III sacral U fracture." From the redacted billing-related documents, it also appears that Sabby's treatment included surgery, laboratory tests, x-rays, implants, physical therapy, "recovery room" services, and pharmacy services. For treatment and services provided between August 22, 2016, and September 2, 2016, Spectrum's charges totaled $225,279.10.

Farm Bureau was responsible for providing Sabby with PIP benefits under the no-fault act. Spectrum submitted Sabby's bills to Farm Bureau for payment, but Farm Bureau only partially paid the bills. In total, Farm Bureau paid Spectrum $180,223.27, or 80% of the total requested, leaving an unpaid balance of $45,055.83. In denying full payment, Farm Bureau maintained that any charges in excess of 80% of Spectrum's gross charges were unreasonable within the meaning of the no-fault act. Accordingly, Farm Bureau refused to pay any more than 80% of Spectrum's total charges. In denial letters dated October 14, 2016, Farm Bureau more fully explained its reasons as follows:

---

[1] *Spectrum Health Hosps v Farm Bureau Mut Ins Co*, unpublished order of the Court of Appeals, entered April 16, 2019 (Docket Nos. 347553 & 348440).

Based on recent court rulings, Farm Bureau understands that in cases not involving insurance your hospital customarily discounts gross charges by twenty percent if payment is made within ninety days of the date the charges are billed. In those cases, the courts have ruled that under MCL 500.3157, charges to no-fault insureds may not exceed eighty percent of gross charges if payment is made within ninety days. Farm Bureau is making payment within thirty one days of the date the charges have been billed. . . .

Furthermore, based on our own investigation, charges in excess of eighty percent of gross charges are charges in excess of reasonable charges. Because under MCL 500.3107(1)(a) and 3157 a hospital's charge to a no-fault insured may not exceed a reasonable charge, this is an additional reason why no-fault benefits are not owed for charges in excess of eighty percent of gross charges.

On August 22, 2017, Spectrum filed the current lawsuit against Farm Bureau.[2] Spectrum sought (1) payment of Sabby's benefits under the no-fault act, (2) a declaratory judgment to the effect that Farm Bureau was liable for payment of Sabby's no-fault benefits, (3) a declaratory judgment providing that Farm Bureau's practice of unilaterally paying only 80% of a claim was unreasonable and violative of the no-fault act, and (4) an award of prefiling interest, costs, and attorney's fees pursuant to MCL 500.3142, MCL 500.3148, MCL 600.6013, and MCR 2.625. In its answer to Spectrum's complaint, Farm Bureau denied that it had any outstanding liability for no-fault benefits. According to Farm Bureau, Spectrum's total charges were in "excess of reasonable charges;" therefore, Farm Bureau did not owe any additional amount.

The parties' arguments regarding the reasonableness of Spectrum's charges and how reasonableness should generally be determined focus primarily on MCL 500.3157, MCL 500.3158, and MCL 500.3159.[3] Relevant to the parties' arguments, MCL 500.3157 provided:

A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may *charge a reasonable amount* for the products, services and accommodations rendered. The charge shall not exceed

---

[2] Sabby was not a party to the case, but Spectrum obtained an assignment from Sabby. And the parties entered into a consent judgment, agreeing that Spectrum was an assignee on the basis of a "valid assignment" of rights. Given the valid assignment, there is no dispute on appeal that Spectrum was permitted to pursue Sabby's no-fault benefits for medical services provided in 2016.

[3] With the enactment of 2019 PA 21, the Legislature substantially amended portions of the no-fault act, including MCL 500.3157, effective June 11, 2019. Spectrum, however, commenced the current case before the effective date of the amendment, meaning that this case is controlled by the former provisions of the no-fault act. See *George v Allstate Ins Co*, __ Mich App __, __; __ NW2d __ (2019); slip op at 3 n 3. Unless otherwise noted, references to the no-fault act are to the version in effect at the time this action was commenced.

the amount the person or institution *customarily charges* for like products, services and accommodations in cases not involving insurance. [Emphasis added.]

MCL 500.3158(2) states:

> A physician, hospital, clinic or other medical institution providing, before or after an accidental bodily injury upon which a claim for personal protection insurance benefits is based, any product, service or accommodation in relation to that or any other injury, or in relation to a condition claimed to be connected with that or any other injury, if requested to do so by the insurer against whom the claim has been made, (a) shall furnish forthwith a written report of the history, condition, treatment and dates and costs of treatment of the injured person and (b) shall produce forthwith and permit inspection and copying of its records regarding the history, condition, treatment and dates and costs of treatment.

And finally, MCL 500.3159 provides:

> In a dispute regarding an insurer's right to discovery of facts about an injured person's earnings or about his history, condition, treatment and dates and costs of treatment, a court may enter an order for the discovery. The order may be made only on motion for good cause shown and upon notice to all persons having an interest, and shall specify the time, place, manner, conditions and scope of the discovery. A court, in order to protect against annoyance, embarrassment or oppression, as justice requires, may enter an order refusing discovery or specifying conditions of discovery and may order payments of costs and expenses of the proceeding, including reasonable fees for the appearance of attorneys at the proceedings, as justice requires.

During discovery, Farm Bureau sought documents and information from Spectrum on matters that Farm Bureau asserted related to the reasonableness of Spectrum's charges for Sabby's care and treatment within the meaning of the no-fault act. Farm Bureau requested information concerning (1) the average annual increase in Spectrum's charges and (2) whether charges for uninsured persons were the same as for individuals with no-fault insurance. With respect to Sabby's charges more specifically, Farm Bureau sought information regarding (1) the amount generally billed for the same care for the same dates of service, (2) the 115% Medicare rate for this care, and (3) the rates Priority Health and Blue Cross/Blue Shield each paid for such care. Farm Bureau also asked whether Spectrum compared its charges to other hospitals, and, if so, whether the charges were comparable. Additionally, Farm Bureau requested that Spectrum produce financial records for the 2015 to 2016 fiscal year, including (1) Spectrum's federal Hospital and Hospital Health Care Complex Cost Reports, (2) Spectrum's IRS Form 990, (3) Spectrum's Audited Financial Statements, (4) Spectrum's Financial Assistance Policy, and (5) various documents related to billing and collection.

Spectrum objected to many, though not all, of these requests on the grounds that the information was "irrelevant and not reasonably calculated to lead to discovery of admissible evidence." Briefly stated, Spectrum indicated that, to support its charges at issue in this case, Spectrum "anticipate[d] that it will rely on its billing and medical records related to the dates of

-4-

service at issue . . . as well as its financial statements and comparative charge data for the years in dispute."

Relevant to its claim that the charges were unreasonable, on the same date that Farm Bureau filed its answer in this case, Farm Bureau also filed an initial witness list, which included, among other witnesses, Mark A. Hall, who was identified as an expert witness. Farm Bureau then filed a motion in limine to qualify Hall as an expert in "health services research" specifically related to healthcare costs. In its motion in limine, Farm Bureau did not present Hall's opinions on the charges related to Sabby in particular. Rather, Farm Bureau offered Hall's general opinions on healthcare costs and the opinions he provided in unrelated cases.

In moving to qualify Hall as an expert and in explaining the relevance of his testimony, Farm Bureau asserted that the no-fault act did not define the term "reasonableness," and in the absence of a definition, the courts should look to the open market, just as courts look to the open market when deciding valuation questions in other contexts. But, on the basis of Hall's opinions, Farm Bureau also maintained that open-market rates could not be determined by looking solely at gross charges or even gross charges customary in the industry. Instead, quoting Hall, Farm Bureau asserted:

> "[T]he market for the prices in medical services is not an effective or functioning market unless patients are represented by an insurance company. If patients seek care outside of their insurance network or if they don't have healthcare insurance, then they're left to whatever doctors and hospitals want to charge and they're not in an effective position to negotiate.
>
> So if one is looking for sort of effective market or competition constraint prices, one needs to look in the part of the market in which insurance companies and government agencies negotiate over prices and not at the part of the market where patients are left to their own devices."

In addition to the amounts paid on the open market, Farm Bureau also asserted that reasonableness should be determined by considering (1) costs to the hospital in providing treatment, including specifically the hospital's cost-to-charge ratio, and (2) "the amount generally billed"[4] for the services. Furthermore, Farm Bureau asserted that Hall should be qualified as an expert on healthcare costs and that he should be allowed to offer an opinion on the reasonableness of charges. In making this argument, Farm Bureau emphasized that, in an unrelated case, the Kalamazoo Circuit Court qualified Hall as an expert on these topics after conducting a *Daubert*[5] hearing. Ultimately, Farm Bureau's motion in limine asked the trial court:

---

[4] The "amount generally billed" is a specific figure that hospitals must calculate for tax purposes.

[5] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

1. For a ruling qualifying Defendants' expert, Mark Hall.

2. For a ruling that the No-Fault Act does not define what is a reasonable charge and the normal rules of evidence apply.

3. For a ruling that what is paid on the open market is relevant to the reasonableness of the gross charge.

4. For a ruling that evidence of payment rates of payers other than no-fault insurers are relevant to the reasonableness of Spectrum's gross charges.

5. For a ruling that Spectrum's ratio of costs to charges is relevant to the issue of the reasonableness of the gross charge.

6. For a ruling that the amount generally billed is relevant, discoverable, and admissible with regard to the reasonableness of the gross charge.

Spectrum filed a response to Farm Bureau's motion. Spectrum indicated that it "did not object" to Hall's qualifications, given his experience, to testify as an expert at trial. Spectrum noted, however, that Hall needed a foundation for his testimony as required by MRE 702 and MRE 703, and Spectrum reserved the right to object to his specific testimony should it fail to meet these requirements. In particular, Spectrum reserved the right to object on the basis of the facts or data used to support Hall's opinions.

Although not objecting to Hall's qualifications as an expert, Spectrum did object to Farm Bureau's requests for a ruling on what constituted relevant and admissible evidence regarding the reasonableness of Spectrum's charges. Detailing the holdings in several opinions issued by this Court and the Michigan Supreme Court, Spectrum asserted that discovery and evidence relating to reasonableness were limited by the no-fault act. More specifically, citing decisions of this Court, Spectrum maintained that, because the focus of MCL 500.3157 is on "charges" and not "payment," the amount that others—such as insurance companies or Medicare—pay for services is not relevant to a determination of reasonableness under the no-fault act. For this reason, Spectrum asked the trial court to deny Farm Bureau's request for a ruling that the amount others pay is relevant and admissible.

Although disputing Farm Bureau's assertion that the amount others pay is relevant, Spectrum did not expressly address Farm Bureau's additional arguments regarding the relevance of (1) a hospital's cost-to-charges ratio or (2) the amount generally billed. At most, in a footnote, Spectrum asserted that in light of *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191; 895 NW2d 490 (2017), the "costs of treatment" a healthcare provider must disclose under MCL 500.3158 were the costs to the *injured person*, "i.e., the provider's charge," as opposed to the provider's costs.

Farm Bureau filed a reply brief, reiterating Hall's opinions regarding the open market and again asserting that payments for healthcare services on the open market were relevant to assessing reasonableness. In making this argument, Farm Bureau attempted to distinguish the cases from this Court discussing the irrelevance of "payments" by asserting that the issue in those cases related to whether a charge was "customary" rather than whether it was "reasonable" within the meaning

of MCL 500.3157. Farm Bureau also more specifically responded to Spectrum's "costs of treatment" argument under MCL 500.3158. Citing *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431; 814 NW2d 670 (2012), Farm Bureau maintained that this Court had already rejected the contention that a healthcare provider's charge was the sole criterion for assessing reasonableness, a conclusion that Farm Bureau contended had not been altered by *Covenant*.

On January 12, 2018, the trial court held a hearing on Farm Bureau's motion in limine. The parties relied on their briefs. Ruling from the bench, the trial court granted Farm Bureau's motion in limine in part and denied it in part. Specifically, the trial court concluded:

> I have read and reviewed this matter. It's kind of an interesting argument brought by the defense here for their expert. But I am going to side with Spectrum Health with regards to this matter. I am going to adopt the law and argument as stated in their brief. I believe that their definition of what is reasonable is appropriate, pursuant to the law in the State of Michigan at this time.

On February 2, 2018, the trial court entered its order, granting in part and denying in part Farm Bureau's motion in limine. The trial court did specify that Hall could testify as an expert, subject to any objections by Spectrum under MRE 702 and MRE 703. But the trial court denied the remainder of Farm Bureau's motion "for the reasons stated on the record."

Thereafter, on March 7, 2018, Farm Bureau moved to compel discovery. Farm Bureau interpreted the trial court's partial denial of its motion in limine, along with the court's acceptance of Spectrum's legal position, as the court's conclusion that the "only evidence relevant" to the reasonableness of Spectrum's charges was evidence bearing on whether the "gross charges are within a reasonable range of gross charges customary in the industry." Recounting the details of its previous discovery request, Farm Bureau asserted that Spectrum should be required to produce documents "consisting of the gross charges of comparable hospitals for the same treatment" provided to Sabby. More specifically, Farm Bureau sought published, publicly-available "charge data" from a source such as "American Hospital Directory.com,"[6] as well as a comparison of Spectrum's gross charges to comparable hospitals.[7]

Subsequently, the trial court entered a stipulated order compelling discovery as follows:

---

[6] American Hospital Directory, *Your Best Source of Hospital Information and Custom Data Services*, <http://www.ahd.com> (accessed February 24, 2020).

[7] Farm Bureau asserted that these types of materials and comparisons had been provided by Spectrum in other cases. As an example, Farm Bureau attached an affidavit from a Spectrum financial director from another lawsuit between Spectrum and Farm Bureau. As set forth in his affidavit and supporting documents, the director conducted various analyses of Spectrum's costs, including comparison of Spectrum's charges for specific treatment codes to the costs of similarly-situated medical providers as reported on the American Hospital Directory website.

IT IS ORDERED THAT Plaintiff shall produce such published, publicly available comparative data printouts from ahd.com, clinical cost analyzer, showing comparative data, including comparative gross change data, from comparable hospitals as Plaintiff may rely on at trial in this case.[8]

Notably, in its motion to compel information about Spectrum's gross charges, Farm Bureau conceded that if the data in question showed that Spectrum's charges were in the reasonable range of gross charges customary in the industry, Farm Bureau would likely agree to a stipulated judgment in Spectrum's favor. But it would do so only if it could preserve its right to challenge the trial court's motion-in-limine order pertaining to Hall and the issue of identifying evidence relevant to determining reasonableness. Indeed, following some additional discovery, Farm Bureau moved for entry of judgment in Spectrum's favor in the amount of $47,820.94. The request for judgment preserved Farm Bureau's right to appeal the trial court's motion-in-limine order and any subsequent award of postjudgment costs and attorney fees. Spectrum initially opposed the motion for entry of judgment, asserting that there was no basis for the judgment and that Farm Bureau simply intended to use this case to argue for a change in the law in the appellate courts.

After moving for entry of judgment, Farm Bureau also filed what it characterized as an offer of proof relating to the trial court's motion-in-limine order. In this offer of proof, Farm Bureau detailed Hall's opinions about reasonableness in general and, more specifically, about the reasonableness of the charges in Sabby's case. With regard to Sabby, Hall considered various documents related to Sabby's treatment, and according to his report, he was prepared to offer various opinions regarding the reasonableness of the charges for Sabby's treatment.[9]

---

[8] In its motion to compel discovery, Farm Bureau also sought evidence of the amount customarily "charged" in cases *not* involving insurance, including information about any 20% discount Spectrum might provide to patients for prompt payment. The order did not mention any discount information, and Farm Bureau does not pursue this argument on appeal.

[9] Those opinions were as follows:

2. Farm Bureau paid $180,223.27 on total gross charges of $225,278.92 for insured Brett Sabby for dates of service August 22, 2016 to September 13, 2016. The treatment provided was the medical service of orthopedic surgery. More specifically, the service was categorized as "Base MS-DRG 956-000-00," which signifies "limb reattachment, hip and femur procedures for multiple significant trauma." Spectrum's charge, payment and cost data for these categories of treatment is reported by American Hospital Directory. See attached Exhibit RE. Data regarding average net payment received is reported in Spectrum's Medicare Cost Report and also by the American Hospital Directory.

3. It is my opinion that $180,223.27 reasonably compensates Spectrum for $225,278.92 of gross charges. This opinion is based on my general knowledge and extensive academic research about the extent to which hospitals typically mark-up charges over costs and the extent to which they discount their list prices when they

-8-

negotiate market rates with third party payers that have some bargaining power. It is also based on the . . . information [in the paragraphs that follow.]

In fiscal year ending June 30, 2016 Spectrum reported to the federal government that, on average, it was paid 49% of its gross charges across all of its patients. The American Hospital Directory (AHD) reports similar or greater rates of charges to payments for the areas of clinical service involved in this case. My opinion is that these actual payment amounts are highly relevant to determining the reasonableness of hospitals' non-discounted charges. Rates accepted from private health insurers are freely negotiated in actual market conditions, and thus are a true reflection of market rates. "List prices" that hospitals set in their "chargemasters" usually have no firm basis in market realities or conditions. Almost no patient or insurer pays these prices, so there are no significant market forces that deter hospitals from setting unreasonable and unrealistic list prices. Also, the markups in hospitals' chargemasters are usually demonstrably unreasonable. Spectrum, like other hospitals, sets its undiscounted prices almost 3 times greater than its actual costs, which is much more than what they willingly accept from private insurers. When hospitals' list prices are demonstrably unreasonable, an alternative basis for determining reasonableness is what a hospital actually agrees to accept from private insurers with whom they negotiate.

Hospitals have less choice over what they receive from public insurers, such as Medicare and Medicaid. Still, these insurers are under statutory legal obligation to pay prices that assure a reasonable level of access for patients. Thus, these government prices have some relationship to market-based reasonableness. Generally speaking, government prices can be thought of as marking a lower bound of reasonable prices, whereas prices from private insurers are closer to the upper range of reasonable prices. Therefore, knowing this actual range of prices from the predominant sources of hospital payment is highly relevant to knowing whether a hospital's list prices exceed what is reasonable.

It is also instructive to compare Spectrum's gross charges to its costs. In fiscal year ending June 30, 2016, Spectrum reported to the federal government that its cost to charge ratio was .350044, and AHD reports a similar ratio (0.3445). This means that Spectrum's gross charges were about 290 percent more than its costs. More specific data reported by AHD shows similar cost to charge ratios (0.37 – 0.38) for the specific medical services relating to limb reattachments, which equates to a 260-270 percent markup.

[4.] Therefore, paying 80 percent of Spectrum's gross charges equates to paying a mark up of more than double its actual costs. Farm Bureau's payment also equates to paying in excess of 60 percent more than what other payers would pay, on average. In my opinion, this amount paid is reasonable for the services rendered.

On August 17, 2018, the trial court held a hearing on Farm Bureau's motion for judgment. At the hearing, the parties indicated that they had reached the "same agreement" that they reached in another case a "few moments ago." That agreement was not specified on the record in the current case. The other case was *Spectrum Health Hosps v Farm Bureau Mut Ins Co* (lower court docket no. 17-02224-NF). On the record in that case, the parties agreed that there was no issue left for a jury and that judgment should enter in the amount sought in the complaint. But the parties did not reach an agreement regarding penalty attorney fees. And they specified that "[e]verything will be preserved for an appeal."

Following the hearing in the current case, the trial court entered a consent judgment. The judgment awarded Spectrum a total of $60,337.17, which consisted of $45,055.82 for unpaid medical charges, $12,271.05 for interest under MCL 500.3142, $375 for costs pursuant to MCR 2.625, and $2,635.30 in prejudgment interest under MCL 600.6013. The consent judgment specified that Spectrum could file a postjudgment motion for attorney fees. The consent judgment also preserved Farm Bureau's right to appeal the trial court's motion-in-limine order.[10]

Spectrum moved for attorney fees under MCL 500.3158, asserting that Farm Bureau's partial denial of payment of Sabby's medical bills was unreasonable for two reasons. First, Spectrum contended that the denial was unreasonable because it was based on the assumption that *all* hospital charges in excess of 80% of gross charges are per se unreasonable. Moreover, according to Spectrum, this general assumption was unreasonable and violative of Farm Bureau's obligations under MCL 500.3157 to review "in each instance whether a charge is reasonable." Second, Spectrum contended that the denial was unreasonable because it was based on Farm Bureau's contention that reasonableness should be measured by amounts that other contracted-payers pay for services despite the fact that this contention had been consistently rejected by the appellate courts. In total, Spectrum sought attorney fees under MCL 500.3148 in the amount of $14,616.50.

Farm Bureau opposed the motion for attorney fees, asserting that its denial of benefits was reasonable because there were legitimate questions of statutory construction and a bona fide factual controversy. First, in asserting that there was a legitimate legal question in this case, Farm Bureau reiterated its contentions that the no-fault act does not define reasonableness, that caselaw on the question of reasonableness was not binding because it constituted obiter dictum, and that the plain meaning of the no-fault act should control. Second, with regard to the facts, Farm Bureau maintained that publicly-available information proved there was a bona fide factual dispute as to the reasonableness of Spectrum's charges.

On March 8, 2019, the trial court held a hearing on Spectrum's motion for attorney fees. The parties relied on their briefs. The trial court denied the request for attorney fees, explaining as follows: "I think this is a question of a bona fide factual uncertainty. I'm going to adopt the law and argument in Farm Bureau's brief . . . ." Thereafter, on March 25, 2019, the trial court entered an order denying Spectrum's motion for attorney fees.

---

[10] The consent judgment also dismissed defendant Farm Bureau Mutual Insurance Company of Michigan with prejudice.

-10-

Both Farm Bureau and Spectrum now appeal to this Court. In Docket No. 347553, Farm Bureau appeals by right the consent judgment, challenging the trial court's motion-in-limine order, which matter was preserved in the consent judgment. In Docket No. 348440, Spectrum appeals by right the trial court's postjudgment denial of attorney fees and costs under MCL 500.3158. The appeals were consolidated.

## II. ANALYSIS

### A. STANDARDS OF REVIEW AND STATUTORY CONSTRUCTION

This Court reviews for an abuse of discretion a trial court's decisions regarding the admission of evidence and discovery matters. *Mueller v Brannigan Bros Restaurants & Taverns LLC*, 323 Mich App 566, 571; 918 NW2d 545 (2018); *Mercy Mt Clemens Corp v Auto Club Ins Ass'n*, 219 Mich App 46, 50-51; 555 NW2d 871 (1996). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Mueller*, 323 Mich App at 571 (quotation marks and citation omitted). We review de novo preliminary or underlying questions of law. *Id.* When a trial court makes a determination that is legally incorrect, the court necessarily commits an abuse of discretion. *Id.* This Court reviews de novo questions of statutory interpretation. *Bazzi v Sentinel Ins Co*, 502 Mich 390, 398; 919 NW2d 20 (2018).

With respect to statutory construction, our goal "is to ascertain and give effect to the Legislature's intent." *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 21; 891 NW2d 528 (2016) (quotation marks and citation omitted).

> [T]he Court must begin with the language of the statute, ascertaining the intent that may reasonably be inferred from its language. It is axiomatic that the words contained in the statute provide the most reliable evidence of the Legislature's intent. The Legislature is presumed to have intended the meaning it plainly expressed, and clear statutory language must be enforced as written. If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written. Only if a statute is ambiguous is judicial construction permitted. [*Bronson*, 295 Mich App at 441-442 (citations omitted).]

### B. DISCUSSION

#### 1. THE NO-FAULT ACT AND THE DISTINCTION BETWEEN REASONABLE AND CUSTOMARY CHARGES

With the enactment of the no-fault act in 1972, the Legislature "eliminated the old automobile tort reparations system" and replaced it with a system of mandatory no-fault insurance under which "an injured insured was guaranteed what the Legislature considered to be a sufficient and expeditious recovery from his or her own insurer for all expenses for reasonably necessary medical care, recovery, and rehabilitation, as well as some incidental expenses." *Muci v State Farm Mut Auto Ins Co*, 478 Mich 178, 187; 732 NW2d 88 (2007). "The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation," *Shavers v Kelley*, 402 Mich 554, 578-579; 267 NW2d 72 (1978), while

-11-

minimizing "administrative delays and factual disputes," *Brown v Home-Owners Ins Co*, 298 Mich App 678, 685-686; 828 NW2d 400 (2012).

But adequate and expeditious compensation were not the no-fault act's only goals. "The no-fault act was as concerned with the rising cost of health care as it was with providing an efficient system of automobile insurance." *Dean v Auto Club Ins Ass'n*, 139 Mich App 266, 273; 362 NW2d 247 (1984). Indeed, "[i]t represents the policy of this state that the existence of no-fault insurance *shall not* increase the cost of health care." *Id.* at 274. Furthermore, the no-fault act was intended to create an affordable system that would restrain insurance premiums. *Stevenson v Reese*, 239 Mich App 513, 519; 609 NW2d 195 (2000); see also *Davey v Detroit Auto Inter-Ins Exch*, 414 Mich 1, 10; 322 NW2d 541 (1982). In short, while the no-fault act sought to "provide individuals injured in motor vehicle accidents assured, adequate and prompt reparation for certain economic losses," it was also intended to provide these benefits "at the lowest cost to the individual and the system." *Gooden v Transamerica Ins Corp of America*, 166 Mich App 793, 800; 420 NW2d 877 (1988).

"The no-fault act provides a comprehensive scheme for payment, as well as recovery, of certain 'no-fault' benefits, including personal protection insurance benefits." *Citizens Ins Co of America v Buck*, 216 Mich App 217, 223; 548 NW2d 680 (1996). "Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . ." MCL 500.3105(1). PIP benefits are payable for "[a]llowable expenses consisting of *reasonable charges* incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MCL 500.3107(1)(a) (emphasis added). The amount that a healthcare provider can "charge" for products and services is further described in MCL 500.3157, which, again, provided as follows before the recent amendment of the no-fault act:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may *charge a reasonable amount* for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution *customarily charges* for like products, services and accommodations in cases not involving insurance. [Emphasis added.]

"When read in harmony, §§ 3107 and 3157 clearly indicate that an insurance carrier need pay no more than a *reasonable* charge and that a health care provider can charge no more than that." *McGill v Auto Ass'n of Mich*, 207 Mich App 402, 406; 526 NW2d 12 (1994) (emphasis added). Under § 3157 it is also clear that a "no-fault insurer is not liable for the amount of any charge that exceeds the health-care provider's *customary* charge for a like product, service, or accommodation in a case not involving insurance." *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 103; 535 NW2d 529 (1995) (emphasis added). A plaintiff seeking payment of no-fault benefits "bears the burden of proving both the reasonableness and the customariness" of the provider's charges. *Munson Med Ctr v Auto Club Ins Ass'n*, 218 Mich App 375, 385; 554 NW2d 49 (1996), overruled in part on other grounds by *Covenant*, 500 Mich at 196.

Notably, the reasonable and customary provisions are two "separate and distinct limitations on the amount health-care providers may charge and what insurers must pay." *Advocacy Org for*

*Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 376; 670 NW2d 569 (2003) (*AOPP*), aff'd 472 Mich 91 (2005). With regard to the customary-charge limitation, "whether there has been an impermissible § 3157 overcharge is determined by looking to the provider's customary charge in cases not involving insurance, meaning those situations where there is literally no insurance in the lay sense of the term—no Medicare, no Medicaid, no BCBSM, and so forth." *Munson*, 218 Mich App at 389-390 (quotation marks and citation omitted). In short, a healthcare provider cannot charge a no-fault insurer—and a no-fault insurer is not liable for—an amount that exceeds the amount that the healthcare provider would customarily charge patients without insurance. See, e.g., *Hofmann*, 211 Mich App at 103-107.

But simply because a charge is "customary" in cases without insurance does *not* necessarily mean that the charge is also reasonable. See *AOPP*, 257 Mich App at 375-376. That is, a "customary" charge does not automatically equate to a "reasonable" charge. *Id*. at 376. The *AOPP* panel explained:

> Rather than defining what is a "reasonable" charge, the clear and unambiguous language of the second sentence in MCL 500.3157 simply places a maximum on what health-care providers may charge in no-fault cases. The first sentence of § 3157 provides that a health-care provider may only charge a reasonable fee, while the second sentence unambiguously provides that a health-care provider's charge for products, services, or accommodations in cases covered by no-fault insurance *shall not exceed* the amount customarily charged in cases not involving insurance. [*Id*. at 375-376 (quotation marks, citations, ellipses, and alteration omitted).]

In other words, under § 3157, a provider's "customary" charge functions as "the cap on what health-care providers can charge," but it is "not, automatically, a 'reasonable' charge requiring full reimbursement under § 3107." *Id*. at 377. "It may be that a health-care provider's 'customary' charge is also reasonable given the services provided, while at other times the 'customary' charge may be too high, and thus unreasonable.[11] Either way, the trier of fact will ultimately determine whether a charge is reasonable." *AOPP*, 257 Mich App at 379. See also *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 95; 693 NW2d 358 (2005) ("[I]t is for the trier of fact to determine whether a medical charge, albeit 'customary,' is also reasonable.").

Accordingly, while the "customary" limitation establishes a cap on charges, the statutory "reasonable amount" restriction on charges also functions as a distinct means of controlling healthcare costs in the context of the no-fault act. See *AOPP*, 257 Mich App at 379; *Hofmann*, 211 Mich App at 113-114. In other words, while health and accident insurance carriers are generally free to contain healthcare costs by placing "dollar limits upon the amounts it will pay to doctors and hospitals for particular services," a no-fault insurer may not do so. *Hofmann*, 211 Mich App at 113-114 (quotation marks and citation omitted). Instead, a no-fault insurer's ability to control costs—indeed its *obligation* to police costs as contemplated by the no-fault act— involves determining "in each instance whether a charge is reasonable in light of the service or

---

[11] But "a charge that is more than that charged to an uninsured person would, by necessity, be unreasonable because of the limitation in § 3157." *AOPP*, 257 Mich App at 377 n 3.

product provided." *AOPP*, 257 Mich App at 379. The requirement that no-fault insurance carriers pay no more than what is reasonable in relation to medical expenses evinces the Legislature's intent to place a check on healthcare providers who are without incentive to keep medical bills at a minimum. *McGill*, 207 Mich App at 408. The Legislature clearly did not intend that no-fault insurers pay all submitted claims absent review of the claims for excessiveness or fraud. *Id.*

Although the no-fault act and this Court's caselaw clearly provide that no-fault insurers have the right and obligation to pay only reasonable charges, the method of determining reasonableness is unclear. As both this Court and the United States Court of Appeals for the Sixth Circuit have recognized, the no-fault act leaves "open the questions of (1) what constitutes a reasonable charge, (2) who decides what is a reasonable charge, and (3) what criteria may be used to determine what is reasonable." *AOPP*, 257 Mich App at 374-375, citing *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 176 F3d 315, 320 (CA 6, 1999). This Court has provided some answers to these questions.

For instance, in terms of who decides what is a reasonable charge, this Court has explained that healthcare providers "necessarily make the initial determination of reasonableness by charging the insured for the services. Once [they] charge the insured, the insurer then makes its own determination regarding what is reasonable and pays that amount to plaintiffs." *AOPP*, 257 Mich App at 379 n 4. If the no-fault insurer does not pay all of the charges, a healthcare provider may file suit to challenge the failure to fully pay the bills. It is the healthcare provider's burden to establish the reasonableness of the charges by a preponderance of the evidence. *Bronson*, 295 Mich App at 450. And "a hospital's itemized bills and records do not, standing alone, satisfy the 'reasonableness' requirement." *Id.* at 452. Whether the amount charged is reasonable is ultimately a question of fact for a jury. *AOPP*, 257 Mich App at 379.

Although it is clear who determines reasonableness, the answers to the questions (1) what constitutes a reasonable charge and (2) what criteria may be used to make this determination are somewhat less certain. See *id.* at 374-375. This Court has approved consideration of some specific factors when determining reasonableness. In *AOPP*, for example, the panel concluded that the no-fault act did not prohibit consideration of charges by other healthcare providers for the same services for purposes of assessing reasonableness. *Id.* at 382. In *Bronson*, 295 Mich App at 449-450, this Court later clarified that a comparison to the charges of other healthcare providers is not and should not be the only means of determining reasonableness. The *Bronson* panel concluded that the cost to a healthcare provider of durable medical supply products used in treating an insured is an appropriate (and discoverable) consideration in determining whether the charge for those products was reasonable. *Id.* at 445-454 (case specifically focused on the actual cost of surgical implant products). Neither *AOPP* nor *Bronson*, however, purported to delineate *all* the permissible factors or evidence that would be relevant to a determination of reasonableness. See *AOPP*, 257 Mich App at 379 ("We will not attempt to delineate the permissible factors for determining what is 'reasonable,' because it is not necessary to do so in resolving plaintiffs' arguments."); see also *Bronson*, 295 Mich App at 449-450.

Against this backdrop, the present case is yet another instance in which a no-fault insurer has denied full payment of charges on the basis that the charges—though apparently consistent with customary charges for patients without insurance—were not reasonable within the meaning of the no-fault act. The issue on appeal concerns the identification of the factors or criteria that may be considered when determining reasonableness. Specifically, Farm Bureau asserts (1) that

reasonableness should be measured by the open market, including what others actually pay for services, (2) that a healthcare provider's cost-to-charge ratio is a permissible factor to be considered when judging reasonableness, and (3) that the "amount generally billed" may also be considered when assessing reasonableness.

## 2. PAYMENTS TO HEALTHCARE PROVIDERS BY THIRD-PARTY PAYERS – THE CASELAW

Although Farm Bureau mentions various types of data allegedly relevant to an assessment of reasonableness, the primary focus of Farm Bureau's appellate briefing is on the payments that healthcare providers accept for services from other payers, including health insurers and government programs such as Medicaid and Medicare. Before considering the merits of Farm Bureau's arguments under the no-fault act regarding the relevance of this information to the reasonableness of a charge, the preliminary question before us is whether this Court's caselaw has already foreclosed consideration of such data. As detailed below, this Court undoubtedly has held, and correctly so, that the amount that others, such as a health insurer or government program, actually pay to a healthcare provider has no bearing on the *customary* prong of § 3157. MCL 500.3157 caps charges at the amount a healthcare provider "*customarily charges* for like products, services and accommodations *in cases not involving insurance.*" (Emphasis added.) But, as discussed earlier, this Court in *AOPP* acknowledged that customary charges do not necessarily equate to reasonable charges. In light of the significant distinction between customary and reasonable, we conclude that this Court's caselaw precluding consideration of third-party payments in the context of the customary inquiry does not control whether those payment may be considered when determining reasonableness.

More specifically, as detailed by the parties, for many years no-fault insurers have sought to limit their liability under the no-fault act to the amounts paid by third parties such as healthcare insurers, Medicaid, Medicare, and even worker's compensation. This Court has repeatedly rejected these attempts, but in doing so, the focus has been on the "customary" prong of § 3157. This Court has refused to *cap* liability for no-fault insurers at the amounts customarily paid by third parties. But this Court has not squarely addressed whether the amounts actually paid by third parties for the same services might be relevant to the reasonableness of a charge.

To begin with, in *Johnson v Mich Mut Ins Co*, 180 Mich App 314, 320; 446 NW2d 899 (1989), "the defendant insurer argue[d] that the trial court committed error requiring reversal in ordering payment of customary hospital charges instead of amounts which Medicaid would have paid had plaintiff not been injured by an automobile." In presenting this argument, the defendant-insurer did *not* question the reasonableness of the charges or the necessity of the services. *Id.* at 321. Instead, the defendant-insurer simply "sought to persuade the trial court that the hospital's charges could only approximate those reimbursable by Medicaid." *Id.* This Court found that assertion "untenable . . . in light of the unambiguous statutory language of MCL 500.3157, which clearly permits health care providers . . . to charge reasonable amounts not exceeding their customary charges for the products, services and accommodations they provide to other injured persons in cases not involving insurance." *Id.* at 321-322. "[U]nder *Johnson*'s reasoning, the acceptance of discounted payments does not define a health care provider's 'customary' charge." *Holland v Trinity Health Care Corp*, 287 Mich App 524, 535; 791 NW2d 724 (2010). But *Johnson* did not answer, nor even address, whether acceptance of discounted payments for services would be relevant to a determination of a "reasonable charge." See *Johnson*, 180 Mich App at 322.

Next, in *Hofmann*, 211 Mich App at 98, the relevant issue again concerned the "customary" prong and, in particular, whether the healthcare providers in that case "violated MCL 500.3157 by charging more for products and services in cases involving no-fault insurance than they customarily charged in cases not involving insurance." In resolving the dispute, the *Hofmann* panel recognized that "the relevant inquiry under § 3157 is not the amount that is customarily charged to other health insurers, but rather the amount that is customarily charged 'in cases not involving insurance.'" *Id.* at 107. More specifically, pertinent to the instant case, the insurer in *Hofmann* argued that the amount Blue Cross and Blue Shield of Michigan (BCBSM) paid as a health insurer should be used to determine the healthcare provider's "customary" charge because, among other reasons, at least 70% of the healthcare provider's patients had BCBSM coverage for the charges in question. *Id.* at 112. In rejecting this argument, this Court reasoned:

> [The insurer's] reasoning is premised on the principle that BCBSM's "payments" to plaintiffs for x-rays, as opposed to plaintiffs' "charges" to BCBSM for those x-rays, are the proper criteria to be used in determining the plaintiffs' "customary charge" for x-rays. This position is untenable, however, in light of the clear statutory language of § 3157, which states that a "charge" in a no-fault case "shall not exceed the amount [a] person or institution customarily *charges* for like products, services and accommodations in cases not involving insurance" (emphasis added). Thus, [the insurer's] reliance on the amount that was "paid" by BCBSM, as opposed to the amount that plaintiffs "charged," is unwarranted.

> Furthermore, [the insurer's] position ignores the fact that the amounts that plaintiffs receive in payment from BCBSM are subject to contractual limitations, whereas the amounts that [the insurer] must pay for covered medical expenses are not limited contractually. Our Supreme Court discussed this distinction in *Auto Club Ins Ass'n v New York Life Ins Co*, 440 Mich 126, 139; 485 NW2d 695 (1992):

>> One way of containing [health care] costs is for an insurer to place dollar limits upon the amounts it will pay to doctors and hospitals for particular services. While health and accident carriers generally are free to establish such limits, *a no-fault insurer is not*. Only the statutory qualification of reasonableness limits the amount that must be paid by a no-fault carrier for covered medical expenses. [Emphasis added.]

> The Court justified this distinction by noting that the obligation of a no-fault carrier is secondary to that of a health or accident insurer in situations where both types of coverage exist. *Id*.

> In essence, [the insurer] is asking this Court to establish a rule that, in situations where other health or accident insurance coverage does not exist, the obligation of a no-fault carrier must be limited to what a health insurer would have had to pay if health insurance existed, notwithstanding that the health insurer's obligation might be controlled by contract, whereas the no-fault carrier's is not. This position does not find support in the no-fault act. [*Hofmann*, 211 Mich App at 113-114.]

-16-

In short, *Hofmann*, consistent with *Johnson*, rejected the assertion that "third-party contractual or statutory limitations [may be used] as a benchmark for determining the extent of a no-fault insurer's liability for payment of a health-care provider's *customary charge*." *Id.* at 109 (emphasis added). Notably, like *Johnson*, the *Hofmann* Court specified that the reasonableness of the charges under § 3157 was not at issue. *Id.* at 114. The *Hofmann* Court expressly qualified its ruling in this respect, stating:

> We note that the absence of contractual limitations in no-fault situations does not give health-care providers liberty to charge no-fault insurers any amount. In addition to the "customary charge" limitation discussed above, §§ 3107 and 3157 also impose a statutory qualification of reasonableness, such that a no-fault carrier is liable only for those medical expenses that constitute a reasonable charge for the product or service. In this case, however, [the insurer] *has not challenged the reasonableness* of the x-rays charges that comprise the basis of its § 3157 counterclaim for reimbursement. [*Id.* (citations omitted; emphasis added).]

*Hofmann*, in other words, recognized a potential distinction between reasonable charges and customary charges, and its holding regarding the irrelevance of payments by third-parties was specific to the customary-charge cap under § 3157.

The distinction between customary and reasonable charges was somewhat muddied by two decisions from this Court following *Hofmann*. First, in *Munson*, 218 Mich App at 378, the no-fault insurer refused to pay the full amount billed and instead paid the healthcare provider according to the fee schedule in the Worker's Disability Compensation Act, MCL 418.101 *et seq*. In recounting the background and facts of the case, the *Munson* panel noted that the insurer contested the reasonableness of the charges in the trial court on the basis that it was unreasonable and unfair to charge no-fault insurers one amount for services while accepting lesser amounts from other sources—such as Medicaid, Medicare, BCBSM, and worker's compensation—as payment for the same services. *Munson*, 218 Mich App at 379-381. Under a heading of "Reasonable and Customary Charges," the Court turned to analysis of the no-fault act, including § 3157. *Id.* at 381. Importantly, while mentioning "reasonable" charges in the opinion, the *Munson* Court focused its analysis solely on customariness rather than reasonableness. Specifically, the Court stated:

> Under th[e] statutory scheme, [the insurer] is required to pay the "customary charges" for services rendered by Munson. The critical issue in this case is what the statutory term "customary charges" means. Munson, of course, argues that "customary charges" means the standard amount it *bills* on behalf of every patient treated, regardless of the fact that Munson routinely *accepts* less than this amount in many cases (Medicare, Medicaid, and BCBSM insured cases). [The insurer] argues that "customary charges" means the lesser amount that Munson actually *accepts* in full satisfaction of the bill for the services rendered. [*Munson*, 218 Mich App at 382.]

After quoting extensively from *Hofmann*, the *Munson* panel then rejected the no-fault insurer's attempt to limit its liability to the amount paid by third-party payers, holding:

> In the instant case, [the insurer's] proffered definition of "customary charges" is the same one that was rejected by *Hofmann*, although [the insurer's]

-17-

benchmark is broader here than it was in *Hofmann*. (Here, [the insurer] defines the benchmark as the amount that Munson received from Medicare, Medicaid, BCBSM, and arguably, worker's compensation.) And, as in *Hofmann*, [the insurer] ignores the limitations placed upon Munson by the federal statutes governing Medicare and Medicaid, by the state statutes governing Medicaid and worker's compensation, and by the contractual arrangement between Munson and BCBSM. Defendant's argument therefore fails for the same reasons it did in *Hofmann*. [*Munson*, 218 Mich App at 385.]

In rejecting reliance on what others pay, after quoting from *Hofmann*, the Court in *Munson* recognized that the proper point of comparison for customariness under § 3157 is those patients without any insurance because "it is obvious that the phrase 'in cases not involving insurance' means those situations where there is literally no 'insurance' in the lay sense of the term—no Medicare, no Medicaid, no BCBSM, and so forth." *Id.* at 390. Finally, in rejecting the insurer's reliance on the worker's compensation fee schedules, *Munson* determined that despite "a strong equitable argument" from the insurer, the worker's compensation fee schedules could not simply be incorporated into the no-fault act, particularly when voter-referendum attempts to amend the no-fault act to include fee schedules had failed. *Id.*

Unlike *Hofmann* and *Johnson*, *Munson* did not expressly limit its holding to the customary prong of § 3157, and indeed the *Munson* Court mentioned reasonableness, to some extent seeming to lump "reasonable and customary" together in its analysis. *Id.* at 381. But despite the reference to reasonableness, we conclude that *Munson* cannot be relied upon as having resolved the question presented in this case, i.e., whether payments by third parties are relevant to the reasonableness of a charge. While alluding to reasonableness, *Munson* stated that "[t]he critical issue in this case is what the statutory term 'customary charges' means." *Id.* at 382. The Court proceeded to analyze the term "customary charge" without any analysis of what a reasonable charge entails. *Id.* at 382-385. For *Munson* to be read as having determined what a reasonable charge entails—and whether third-party payments are relevant to reasonableness—the *Munson* panel would have had to assume that reasonableness and customariness were coextensive. Such an assumption, however, is not expressly stated anywhere in *Munson*, and in any event, "[i]t is a well-settled principle that a point assumed without consideration is of course not decided." *2 Crooked Creek, LLC v Cass Co Treasurer*, 329 Mich App 22, 46; 941 NW2d 88 (2019) (quotation marks and citation omitted). And, perhaps more importantly, the assumption that reasonableness and customariness are one and the same has absolutely no validity after *AOPP*. See *AOPP*, 257 Mich App at 376-377.

Indeed, *Munson*'s failure to analyze reasonableness is particularly notable in light of *AOPP*. The foundational premise of *Munson*'s analysis was that the no-fault act *requires* the insurer "to pay the 'customary charges' for services rendered by" the healthcare provider. *Munson*, 218 Mich App at 382. But of course, under *AOPP* and the plain language of the no-fault act, this is not an accurate statement. Rather, the customary inquiry is "separate and distinct" from the reasonableness determination. And while a provider's "customary" charge functions as "the cap on what health-care providers can charge," it is "not, automatically, a 'reasonable' charge requiring full reimbursement under § 3107." *AOPP*, 257 Mich App at 376-377.

To the extent *AOPP* and *Munson* could be read to conflict insofar as *Munson* states that an insurer is required to pay customary charges, it bears emphasizing that the Michigan Supreme

-18-

Court affirmed this Court's decision in *AOPP*, agreeing that "it is for the trier of fact to determine whether a medical charge, albeit 'customary,' is also reasonable." *AOPP*, 472 Mich at 95. By lumping reasonable and customary together and analyzing customariness while wholly failing to provide any analysis of reasonableness, the *Munson* panel failed to recognize the distinction between reasonable and customary. And it ultimately did not consider or decide the question whether evidence of third-party payments may be relevant to *reasonableness*. In short, reasonable and customary are separate questions. Rather than assume that *Munson* answered the reasonableness question presented in this case, we read the *Munson* decision as simply having resolved the customariness issue that it actually decided. Any incidental reference to "reasonable" in *Munson* was nothing more than dictum. See *People v Aaron*, 409 Mich 672, 722; 299 NW2d 304 (1980) ("While there are some cases containing language which may be construed as assuming the existence of such a rule in Michigan, the language is clearly dictum as the question was neither at issue nor expressly considered."). Consequently, like *Johnson* and *Hofmann*, *Munson* does not provide the answer to the question in this case.

The issue of third-party payers arose again in *Mercy Mt Clemens*, 219 Mich App at 49, wherein the insurer asserted that a " 'charge' means the amount customarily accepted by a plaintiff as payment in full." (Quotation marks omitted.) On the basis of this interpretation, the insurer sought discovery of information about the amounts actually paid by "third-party payers such as Medicare, Medicaid, Blue Cross-Blue Shield . . ., worker's compensation insurers, health maintenance organizations (HMOs), and preferred provider organizations (PPOs)." *Id*. at 48. The healthcare providers sought a protective order, arguing that information about third-party payers was irrelevant because "under § 3157 their charges could not exceed the amount customarily charged for such services 'in cases not involving insurance.' " *Id.* at 49. The trial court agreed with the healthcare providers that amounts paid by third parties were not relevant and "were outside the parameters of discovery." *Id.* at 50.

On appeal, the issue was framed as whether "reference to 'insurance' in § 3157 . . . should be read to refer to no-fault insurance only, rather than all types of insurance that provide payment for medical care." *Id.* The Court answered this question in the negative, ruling that "[t]he words 'in cases not involving insurance' in § 3157 should not be interpreted to mean 'in cases not involving no-fault insurance.' " *Id.* at 51. The *Mercy Mt Clemens* panel held:

> [R]eimbursement from Medicare, Medicaid, and worker's compensation insurance is set by statutory and regulatory limitations. Reimbursement from Blue Cross, HMOs, and PPOs is set by contracts between those entities and health-care providers. Under *Munson*, *Hofmann*, *Hicks*, and *Johnson*, such information is not admissible to prove the customary charge that defendant must pay under § 3157. . . . In light of this precedent, we conclude that the circuit court did not err in finding that the information sought on discovery was not relevant to whether the amounts charged by plaintiffs met the requirements of §§ 3107 and 3157 of the no-fault act and that it was not reasonably calculated to lead to the discovery of admissible evidence. The circuit court did not abuse its discretion by granting plaintiff's requested protective order. [*Mercy Mt Clemens*, 219 Mich App at 54-55.]

This Court also noted that "[r]egardless of whether third-party health-coverage providers such as Medicare, Medicaid, worker's compensation, Blue Cross, HMOs, and PPOs are technically insurance carriers, the amounts that plaintiffs accepted as payment in full from those entities cannot

-19-

be used to prove the customary charge for those services under § 3157 of the no-fault act." *Id.* at 55.

Very much like *Munson*, the decision in *Mercy Mt Clemens* mentioned reasonable charges and acknowledged that charges must be reasonable. *Id.* at 52. But, like *Munson*, the analysis then focused solely on the question of customary charges and whether third-party payments were relevant to determining a customary charge in cases not involving insurance. *Id.* at 52-55. Missing from *Mercy Mt Clemens* was a recognition that customary charges are not necessarily reasonable and that an insurer need not automatically pay a customary charge. Rather than assume *Mercy Mt Clemens* answered the reasonableness question presented in the instant case, we construe that decision as simply having resolved the customariness issue that it actually addressed and decided. And any incidental reference to "reasonable" in *Mercy Mt Clemens* was nothing more than dictum. See *Aaron*, 409 Mich at 722. Consequently, like the other cases cited by Spectrum, *Mercy Mt Clemens* does not provide the answer to the question in this case.

The first case to actually address the separate and distinct question of reasonableness was *AOPP*. As detailed earlier, the panel in *AOPP*, 257 Mich App at 376, determined that "the 'customary charge' limitation in § 3157 and the 'reasonableness' language in § 3107 constitute separate and distinct limitations on the amount health-care providers may charge and what insurers must pay with respect to victims of automobile accidents who are covered by no-fault insurance." Because they are separate inquiries, and an insurer only has to pay a reasonable charge (subject to a customary-charge cap), *AOPP* also determined that an insurer did not necessarily have to pay a charge simply because it represented a customary charge in cases not involving insurance. *Id.* at 376-379.

While addressing reasonableness, *AOPP* did *not* involve a situation in which the insurer sought to have reasonableness determined on the basis of the amounts paid by third parties. Indeed, this Court in *AOPP* noted that the no-fault insurer did not attempt to use worker's compensation fee schedules, nor did the insurer try to make comparisons to the amounts paid by health insurers, Medicaid, or Medicare. *Id.* at 381-382. Instead, *AOPP* entailed an insurer's use of an 80th percentile test that assessed reasonableness by comparison to the amounts charged by other healthcare providers rendering the same service. *Id.* More specifically, under the test, payment is recommended "of one hundred percent of the charges as long as the charge does not exceed the highest charge for the same procedure charged by eighty percent of other providers rendering the same service." *Id.* The Court held that "the criterion . . . used [by the insurer] in determining whether a particular charge is reasonable is not precluded under the plain language of the statute or Michigan case law." *Id.* at 381. As part of its analysis, the *AOPP* panel stated:

> Indeed, the panels in *Mercy Mt Clemens*, *Munson*, and *Hofmann* each concluded that the data regarding payments made by third-party payers could not be used to determine the customary charge under § 3157. In contrast, this case involves defendants' review of plaintiffs' medical charges for reasonableness under § 3107 by comparing plaintiffs' charges to those of other providers for similar services. [*AOPP*, 257 Mich App at 382 (citation omitted).]

Spectrum asserts here that *AOPP* rejected comparisons to third-party payers because they are irrelevant to the determination of reasonableness. But that question was simply not addressed in *AOPP*.

In sum, while there may be cases from this Court containing language that might be construed as precluding consideration of amounts paid by third parties when determining the reasonableness of an amount charged by a healthcare provider, a careful review of the caselaw shows that this specific question was neither at issue nor expressly considered in these decisions. In other words, there is, at most, obiter dictum on this question, which lacks the force of adjudication and is, therefore, not binding on this Court under the principle of stare decisis. *Aaron*, 409 Mich at 722; *2 Crooked Creek*, 329 Mich App at 46.

## 3. REASONABLENESS AND THE RELEVANCE OF THIRD-PARTY PAYMENTS

The question, of course, becomes whether third-party payments are a permissible consideration under the no-fault act for purposes of assessing reasonableness. Again, under § 3107(1)(a), an insurer is liable for "[a]llowable expenses consisting of *reasonable charges* incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. . . ." (Emphasis added.) And MCL 500.3157 provides additional details about what a healthcare provider can charge for its services. As commonly understood, "a 'charge' is a '[p]ecuniary burden, cost' or '[a] price required or demanded for service rendered or goods supplied.' " *Douglas v Allstate Ins Co*, 492 Mich 241, 267; 821 NW2d 472 (2012) (citation omitted; alterations in original). Generally speaking, absent a contractual limitation or some other restriction imposed by law, healthcare providers are "free to charge the public whatever they want[.]" *Mich Ass'n of Psychotherapy Clinics v Blue Cross & Blue Shield of Mich*, 118 Mich App 505, 528; 325 NW2d 471 (1982). In the no-fault context, however, healthcare providers are *not* free to charge whatever they want. Rather, §§ 3107(1)(a) and 3157 limit a charge to a "reasonable" amount, so long as it does not exceed the amount customarily charged.

Although "[t]he Legislature selected 'reasonableness' as the operative criterion for determining the amount of a charge for services," *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 671-672; 819 NW2d 28 (2011), the Legislature did not define the term "reasonable," *AOPP*, 257 Mich App at 379. Relying on dictionary definitions, the Michigan Supreme Court has generally defined the term "reasonable" as follows:

> The term "reasonable" commonly refers to that which is "agreeable to or in accord with reason; logical," or "not exceeding the limit prescribed by reason; not excessive[.]" The term "reasonable" has also been defined to mean "fair, proper, or moderate under the circumstances" and "[f]it and appropriate to the end in view." [*Krohn v Home-Owners Ins Co*, 490 Mich 145, 159; 802 NW2d 281 (2011) (citations omitted; alterations in original).]

Pursuant to this common understanding of the term "reasonable," we see that a healthcare provider's charge must be fair, proper, or moderate, in accord with reason, and not excessive. A determination of reasonableness—while initially made by the healthcare provider and independently reviewed by the insurer—is ultimately a question for the fact-finder. See *Bronson*, 295 Mich App at 448.

In this context, the issue in this case is simply whether amounts paid for the same services by health insurers and others, such as Medicaid and Medicare, may be *considered* by a fact-finder as a point of comparison for determining whether the amount a healthcare provider charged a no-fault insurer was reasonable. We conclude that while it is certainly not dispositive of the

-21-

reasonableness of a charge, the amount that third-parties pay is nevertheless evidence bearing on the reasonableness of a healthcare provider's fees. Cf. *Bronson*, 295 Mich App at 454 ("[P]laintiff's actual cost for the surgical implant products is not dispositive on the issue whether its charges were reasonable; however, the actual cost of the durable medical equipment is certainly a piece of the overall 'collage of factors affecting the reasonable rate' of plaintiff's charges."). Simply put, third-party payments which are accepted by a healthcare provider as payment in full during the pertinent timeframe for products and services are relevant to determining the reasonableness of charges for those very same products and services in the context of treatment covered by PIP benefits.

In *Hardrick*, 294 Mich App at 667-668, this Court discussed the characteristics of relevant evidence, explaining as follows:

> Relevant evidence is evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. MRE 401 (emphasis added). Relevance divides into two components: materiality and probative value. Material evidence relates to a fact of consequence to the action. A material fact need not be an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy. Materiality looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial. . . .

> To be relevant, evidence must tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. . . . The threshold is minimal: any tendency is sufficient probative force. Evidence is relevant if it in some degree advances the inquiry, and is not objectionable simply because it fails to supply conclusive proof. No single item of evidence can be rejected upon the sole ground that it falls short of making a case; if it contributes to that end it must be received, and its sufficiency in connection with the other evidence must be determined on a review of the whole when the case is closed. [Quotation marks, citations, and alteration omitted.]

In this case, the question is whether the charges for Sabby's surgery and other medical treatments and services were reasonable. In this context, comparison of the amounts that Spectrum charged for the services Sabby received to the amounts that others actually paid for the same services during the same general timeframe—and that Spectrum accepted as payment in full for these services—tends to make it more or less likely that the amounts Spectrum charged were reasonable or unreasonable. That is, what others actually pay can be used to measure the value of the medical services provided and can constitute a useful point of comparison for assessing the reasonableness of medical charges. This evidence, supplying one measure of the value of the services provided, "throws some light, however faint, on the reasonableness of a charge" and is therefore worthy of a jury's consideration. See *Bronson*, 295 Mich App at 452 (quotation marks and citation omitted).

Indeed, unlike the customary-charge cap, which is expressly limited to comparison of the charges to cases not involving insurance, the reasonableness prong does not contain any similar

restriction. See MCL 500.3157. Rather, it is more broadly concerned with ensuring that a charge is fair and not excessive, and this concern invites comparison to amounts actually being paid on the open market. See, e.g., *Douglas*, 492 Mich at 275 ("The compensation actually paid to caregivers who provide similar services is necessarily relevant to the fact-finder's determination of a reasonable charge for a family member's provision of these services because it helps the fact-finder to determine what the caregivers could receive on the open market."). We agree with the following sentiments of the Georgia Supreme Court in *Bowden v The Med Ctr, Inc*, 297 Ga 285, 292; 773 SE2d 692 (2015):

> The amounts that TMC charged to (and agreed to accept as payment in full from) other patients treated at the same hospital for the same type of care during the same general time frame that Bowden was treated may not be dispositive of whether TMC's charges for Bowden's care were "reasonable" under OCGA § 44–14–470(b), to the extent that the other patients were not similarly situated in other economically meaningful ways. But that does not mean that how much TMC charged those other patients is entirely irrelevant—particularly in the broad discovery sense—to the reasonableness of the charges for Bowden's care.

> The fair and reasonable value of goods and services is often determined by considering what similar buyers and sellers have paid and received for the same product in the same market, with adjustments upward or downward made to account for pertinent differences, and we see no reason why the same cannot be true of health care. [Citation omitted.[12]]

A medical provider's typical price cannot be deemed reasonable unless it reflects an amount that is actually being charged in the marketplace, and a realistic standard considers the amount insurers actually pay and the amount a medical provider is willing to accept. *Nassau Anesthesia Assoc PC v Chin*, 32 Misc3d 282, 286; 924 NYS2d 252 (2011). Quite simply, when determining reasonableness, the amount that others pay for the same goods or services is a pertinent factor to be considered when deciding whether a charge of those same goods or services is reasonable.[13]

---

[12] Cases from other jurisdictions, while not binding, may be considered persuasive. *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006).

[13] Although we hold that the amount third parties pay for products and services may be relevant to a determination of reasonableness, the evidence needs to be specific to the particular charges at issue and cover the same general timeframe. See *AOPP*, 257 Mich App at 379 (a no-fault insurer need only pay a reasonable charge "for the particular product or service"). General information and broad statistics are irrelevant to the question whether the particular charges in a given case were reasonable. Thus, an insurer would not be justified in uniformly reducing the payment on all medical bills by a set percentage based on general statistics. Instead, each case and each expense needs to be considered and analyzed individually. Here, while Farm Bureau offered general information about the healthcare market and Hall's general opinions on reasonableness, it also provided Hall's opinions specifically with respect to Spectrum's particular charges related to its

-23-

We emphasize that the amount third parties pay does *not* conclusively establish a reasonable amount. Instead, in ruling that third-party payments may be relevant, we are simply indicating that such evidence may be *considered* as a point of comparison to assist the trier of fact in determining the amount of a reasonable charge for the services in question. See *Bronson*, 295 Mich App at 451-454. The amount paid by others for the same services is just one measure—among all the evidence the parties might wish to present—regarding the reasonableness of the charges. See *id*.

For instance, a healthcare provider would be free to present evidence and to argue that its charges were similar to those of other providers. And there are, of course, reasons why health insurers, Medicare, and Medicaid pay less, including contractual and statutory limitations, see *Mercy Mt Clemens*, 219 Mich App at 54, and a healthcare provider could present these factors and distinctions to a jury. In view of these differences and any other evidence presented, the jury would be fee to give the evidence regarding third-party payers little or no weight and to instead conclude that the amount charged to uninsured individuals, or some other amount, is a better measure of reasonableness. But the fact that there are different measures and factors bearing on the assessment of reasonableness—and potential weaknesses in the evidence Farm Bureau wishes to present—does not render evidence of third-party payments irrelevant as a matter of law. See *Bronson*, 295 Mich App at 451-454. Instead, a jury should be presented with the complete picture of the range of charges and payments for medical services on the open market.

In sum, when assessing the reasonableness of a medical charge, relevant evidence includes the full range of charges and payments falling within the pertinent timeframe for the particular services, products, and treatment at issue in the case. Among that evidence, the jury may consider the amounts paid by third parties because such evidence " 'throws some light on the reasonableness of the charges.' " *Bronson*, 295 Mich App at 452 (citation omitted).

In contrast to this conclusion, Spectrum relies heavily on *Johnson*, *Munson*, *Mercy Mt Clemens*, *Hofmann*, and *AOPP* for the proposition that the amount third parties pay for medical services is not relevant to the assessment of reasonable charges under § 3157. As discussed, these cases did not actually resolve the question presented in this case—specifically, whether payments by third parties are relevant to the determination of *reasonableness*. Nevertheless, one additional point about these cases warrants discussion in light of Spectrum's arguments on appeal. Specifically, in analyzing the customary prong, some of the cases addressed the significance of the use of the term "charges" in §§ 3107(1)(a) and 3157, noting that "payments" are not the same thing as "charges." See, e.g., *Hofmann*, 211 Mich App at 113-114. Employing this reasoning, Spectrum contends that, whether considering customariness or reasonableness, *payments* are not relevant to an analysis of *charges*.

Certainly, "charges" and "payments" are different terms, and the amount someone typically charges for services may not be the same as the amount someone is actually paid for those services. See, e.g., *Law v Griffith*, 457 Mass 349, 357; 930 NE2d 126 (2010) ("The only patients actually paying the stated charges are the uninsured, a small fraction of medical bill payors."). But the

---

treatment of Sabby and the amount charged to Farm Bureau as compared to what others would pay.

-24-

significance of this basic distinction between a "charge" and a "payment" falls away when the inquiry becomes one of reasonableness. Under the customary prong of § 3157, the sole question concerns the amount the healthcare provider *customarily charges* in cases not involving insurance, and actual payments matter not at all in answering this question. But when the reasonableness of those charges is at issue, the charges alone—even if customary and even if comparable to the charges of other healthcare providers—cannot be absolutely dispositive of their reasonableness.

> To limit assessing the reasonableness of provider charges solely to a comparison of such charges among similar providers would be to leave the determination of reasonableness solely in the hands of providers, as a collective group, and would abrogate the cost-policing function of no-fault insurers, contrary to the intention of the Legislature. [*Bronson*, 295 Mich App at 449-450.]

Instead, in the context of reasonableness, a difference between the amount paid by third parties when compared to no-fault insurers and the uninsured is clearly relevant to, though not dispositive of, an assessment of reasonableness. To conclude otherwise would be to require the jury to ignore the realities of the marketplace when, in actuality, "the market for a particular service bears on its reasonableness." *Hardrick*, 294 Mich App at 671-672. And "the parameters of the relevant market present jury questions." *Id.* at 672. When determining reasonableness, the jury cannot be limited to consideration of a healthcare provider's "charges" for services but must be allowed to contemplate the value of the services on the market, including reflection on the amounts paid for such services by third parties.

Textually, in concluding that use of the word "charges" in § 3157 does not preclude consideration of "payments" when assessing reasonableness, we again emphasize that consideration of payments is simply one measure for the jury to ponder; it is certainly not dispositive. We do not suggest that "payments" necessarily establish the unreasonableness of a charge. The issue is simply whether evidence of payments by third parties may be considered by the fact-finder when gauging the reasonableness of charges. And we hold that nothing in the plain language of § 3107(1)(a) or § 3157 precludes consideration of third-party payments when determining a no-fault insurer's liability for reasonable charges.

4.  MCL 500.3158 AND MCL 500.3159

Even if relevant, Spectrum contends that the evidence Farm Bureau seeks to admit should be excluded because it is not discoverable under §§ 3158 and 3159. Spectrum more specifically contends that evidence relating to Spectrum's costs is not relevant or discoverable because *Covenant* overruled this Court's decision in *Bronson*, and as a result, only "costs *to* the injured person," i.e., the provider's charges, are relevant and discoverable. Contrary to these assertions, *Covenant* did not overrule *Bronson*. With regard to the specific evidence in question, *Bronson* appears to have limited applicability to the current case because Farm Bureau has not particularly sought discovery of a "standalone" item, the cost for which is easily quantifiable. Instead, the evidence Farm Bureau seeks to admit is based on publicly available data. While this information may not be obtainable directly from Spectrum under §§ 3158 and 3159, nothing in the no-fault act prevents Farm Bureau from introducing publicly available data with the proper foundation.

Generally, Michigan follows an open and broad approach to discovery, permitting discovery "for any relevant matter, unless privileged." *Bronson*, 295 Mich App at 443. "However,

a trial court should also protect the interests of the party opposing discovery so as not to subject that party to excessive, abusive, or irrelevant discovery requests." *Id.* (quotation marks and citation omitted). The no-fault act contains two provisions regarding discovery that are relevant to this case. First, § 3158(2) provides:

> A physician, hospital, clinic or other medical institution providing, before or after an accidental bodily injury upon which a claim for personal protection insurance benefits is based, any product, service or accommodation in relation to that or any other injury, or in relation to a condition claimed to be connected with that or any other injury, if requested to do so by the insurer against whom the claim has been made, (a) shall furnish forthwith a written report of the history, condition, treatment and dates and costs of treatment of the injured person and (b) shall produce forthwith and permit inspection and copying of its records regarding the history, condition, treatment and dates and costs of treatment.

Additionally, § 3159 provides:

> In a dispute regarding an insurer's right to discovery of facts about an injured person's earnings or about his history, condition, treatment and dates and costs of treatment, a court may enter an order for the discovery. The order may be made only on motion for good cause shown and upon notice to all persons having an interest, and shall specify the time, place, manner, conditions and scope of the discovery. A court, in order to protect against annoyance, embarrassment or oppression, as justice requires, may enter an order refusing discovery or specifying conditions of discovery and may order payments of costs and expenses of the proceeding, including reasonable fees for the appearance of attorneys at the proceedings, as justice requires.

In this case, Spectrum asserts that these statutory provisions preclude discovery of the information Farm Bureau seeks and that because discovery is not allowed, it also follows that the information is not relevant or admissible. We disagree. The discovery devices specified in the no-fault act do not necessarily represent "the complete panoply of discovery tools that the Legislature intended to provide in connection with mandatory no-fault insurance coverage." *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 598 n 14; 648 NW2d 591 (2002). Much, if not all, of the information Farm Bureau wants to rely upon regarding payments by third parties and average cost-to-payment ratios is publicly available and was obtained by Farm Bureau from various sources. Sections 3158 and 3159 of the no-fault act might not specifically require Spectrum to provide this information to Farm Bureau. But nothing in § 3158 or § 3159 precludes the consideration of publicly available data, so to craft such a limitation from the Legislature's silence on publicly available data would unjustifiably hinder no-fault insurers in responsibly investigating claims. Cf. *Cruz*, 466 Mich at 598 n 14 (concluding no-fault discovery mechanisms were "not comprehensive"). Moreover, given that the information is publicly available, Farm Bureau's accessing the information cannot plausibly run afoul of § 3159's protections against annoyance, embarrassment, or oppression. Indeed, considering that the information is publicly available, the question is not really one of discovery, but admissibility. So provided that the data is relevant and otherwise admissible under the rules of evidence, neither § 3158 nor § 3159 precludes its admission.

On appeal, with regard to the costs of treatment, Spectrum also specifically argues that this Court's decision in *Bronson*, permitting discovery of a healthcare provider's costs (at least to the extent those costs may be easily quantified), was implicitly overruled by *Covenant*. In *Bronson*, 295 Mich App at 450-451, this Court reasoned:

> In keeping with the insurer's obligation to determine the reasonableness of a provider's charges, we believe that defendants were entitled to discover the wholesale cost of the surgical implant products for which the insureds were charged. The no-fault act, MCL 500.3158(2), permits defendants to discover plaintiff's "costs of treatment *of* the injured person," not the "costs of treatment *to* the injured person," which presumably are plaintiff's customary charges. (Emphasis added.) Accordingly, defendants are permitted to consider the cost *to plaintiff* of providing that treatment and not merely the cost of treatment as billed by the provider to the injured person when evaluating the reasonableness of the charges submitted for payment. We recognize that permitting insurers access to a provider's cost information could open the door to nearly unlimited inquiry into the business operations of a provider, including into such concerns as employee wages and benefits. However, we explicitly limit our ruling to the sort of durable medical-supply products at issue here, which are billed separately and distinctly from other treatment services and which defendants represent (and plaintiff has not disputed) require little or no handling or storage by a provider. The surgical implant products here are standalone items that can be easily quantified. Plaintiff must come forward with evidence to convince a jury that the charges for the durable medical equipment were reasonable.

*Bronson* has limited application to the current facts. That is, at least on appeal, Farm Bureau has not identified a need for information about Spectrum's costs for specific "durable medical-supply products." Instead, Farm Bureau's arguments focus on publicly available data regarding costs relative to charges, an issue which *Bronson* simply did not address. Although not the type of information at issue in *Bronson*, contemplation of this publicly available data is not precluded by § 3158 or § 3159, and because it is publicly available, it does not run afoul of *Bronson*'s concern about opening the door to unlimited discovery requests of a healthcare provider. In short, *Bronson*'s specific discovery holding seems to have little bearing on the present case.

Nevertheless, we address Spectrum's assertion that *Covenant* implicitly overruled *Bronson* because in making this argument, Spectrum purports to find support for its more general assertion that the reasonableness of medical charges is defined *solely* by comparison to charges among similar healthcare providers. In *Bronson*, this Court expressly rejected the contention that reasonableness could be determined solely by comparison of a provider's charges to similar providers. The *Bronson* panel reasoned that such an approach "would be to leave the determination of reasonableness solely in the hands of providers, as a collective group, and would abrogate the cost-policing function of no-fault insurers, contrary to the intention of the Legislature." *Bronson*, 295 Mich App at 449-450. In concluding that costs were also relevant, this Court noted that § 3158(2) permits discovery of the " 'costs of treatment *of* the injured person.' " *Id.* at 450. In contrast to this conclusion, Spectrum now argues on appeal that § 3158(2) should be read to allow discovery only of the costs of treatment *to* the injured person, i.e., a provider's

charges, meaning that the sole point of comparison for determining reasonableness would be a comparison of *charges*.

In analyzing the text of § 3158(2), Spectrum maintains that *Bronson* implicitly involved a misapplication of the last antecedent rule.[14] That is, Spectrum contends that this Court erred by reading the phrase "of the injured person" to only modify "costs of treatment" when "of the injured person" should also be read to modify "history, condition, treatment and dates" as used in § 3158(2). Read in this manner, Spectrum asserts that the Legislature chose "of" because one does not say, for example, "history to the injured person." Spectrum also appears to believe that the Legislature chose "of" to denote a possessive relationship. In other words, according to Spectrum, the Legislature actually meant to say "*injured person's* history, condition, treatment and dates and costs of treatment."

*Bronson* clearly rejected this position.[15] But Spectrum maintains that *Bronson*'s construction is no longer good law because *Covenant* held that the statutory cause of action for no-fault benefits belongs to the injured person, not a healthcare provider. Spectrum notes that *Bronson* operated under the assumption that healthcare providers could file suit against an insurer. See *Bronson*, 295 Mich App at 450. And Spectrum emphasizes that the *Covenant* Court looked briefly at § 3158(2), noting that this provision "simply requires that a healthcare provider make the injured person's medical records and certain treatment information available to the insurer." *Covenant*, 500 Mich at 205-206.

Contrary to Spectrum's assertions that *Covenant* overruled *Bronson*, this Court has already recognized that *Covenant* did not affect the method for determining reasonableness as articulated in *AOPP* and *Bronson*. *Auto-Owners Ins Co v Compass Healthcare PLC*, 326 Mich App 595, 609-610; 928 NW2d 726 (2018). The *Compass Healthcare* panel stated:

> As the trial court concluded in its opinion and order on reconsideration, "[t]he only effect of *Covenant* was to place the dispute over the reasonableness of the charges between a provider and a patient-insured, rather than between a

---

[14] The last antecedent rule is a grammatical rule which "provides that a modifying or restrictive word or clause contained in a statute is confined solely to the immediately preceding clause or last antecedent, unless something in the statute requires a different interpretation." *Tuscola Co Bd of Comm'rs v Tuscola Co Apportionment Comm*, 262 Mich App 421, 425; 686 NW2d 495 (2004) (quotation marks and citation omitted). There is no mention of this rule in *Bronson*.

[15] Contrary to Spectrum's arguments, *Bronson* did not purport to apply the last antecedent rule; and *Bronson* was also clearly correct in not rewriting § 3158(2) in the manner requested by Spectrum. Had the Legislature intended to say "the *injured person's* history, condition, treatment and dates and costs of treatment," it could have easily used this phrase. See *Yaldo v North Pointe Ins Co*, 457 Mich 341, 346; 578 NW2d 274 (1998). Instead, relevant to this case, the Legislature provided for discovery of the "costs of treatment of the injured person," and *Bronson* properly concluded that the Legislature intended the meaning it clearly and unambiguously expressed. See *Yaldo*, 457 Mich at 346.

provider and an insurer." It did not alter the method of disputing the reasonableness of the amount paid. [*Id.* at 610 (alteration in original).]

Indeed, there is nothing inconsistent between *Bronson*'s discovery ruling and *Covenant*. To the contrary, the crux of *Covenant*'s statutory analysis was that the "the no-fault act does not, in any provision, explicitly confer on healthcare providers a direct cause of action against insurers." *Covenant*, 500 Mich at 204-205. And the Supreme Court also could not find any such cause of action in the no-fault provisions "that do not explicitly refer to healthcare providers." *Id.* at 206-218. In comparison, relevant to *Bronson*'s conclusion, the no-fault act expressly mentions healthcare providers in § 3158(2) and explicitly imposes a duty on healthcare providers to disclose the "costs of treatment of the injured person." The fact that healthcare providers lack a statutory cause of action does not alter their express obligation to comply with § 3158(2). Even before *Covenant*, this obligation existed in cases brought by an injured person rather than a healthcare provider. In short, *Covenant* did not overrule *Bronson*, it did not alter the method of disputing reasonableness, and it did not otherwise change a healthcare provider's obligation to comply with § 3158(2). In sum, the discovery provisions in §§ 3158 and 3159 do not compel the conclusion that consideration of third-party payments is barred by the no-fault act.

## 5. APPLICATION

The trial court denied Farm Bureau's motion in limine regarding the relevance and admissibility of evidence, agreeing with Spectrum's assertion that this Court's caselaw construing § 3157 categorically precluded the admission of evidence of third-party payments for similar services. For the reasons set forth in this opinion, we hold that evidence regarding third-party payments *may* be relevant and admissible for purposes of assessing reasonableness under § 3107(1)(a) and § 3157. And the trial court's blanket exclusion of this evidence constituted an error of law amounting to an abuse of discretion. See *Mueller*, 323 Mich App at 571. To be clear, we do not hold as a matter of law that the evidence offered by Farm Bureau is relevant and admissible; rather, we reverse the trial court's ruling and remand the matter for the trial court to make the determination in the first instance under the proper legal framework. Cf. *In re Kerr*, 323 Mich App 407, 412; 917 NW2d 408 (2018) (remanding for a new evidentiary ruling when trial court's exclusion of evidence was based on an error of law). The trial court has not yet considered the relevance of the specific data in question to the particular healthcare charges at issue in this case that were billed in 2016, nor has the court addressed Hall's particular methodologies in analyzing that data.[16] The record must also be developed with respect to the precise cost information Farm Bureau seeks to discover and whether the cost information meets the standards in *Bronson*.

---

[16] For instance, on appeal, in a footnote, Spectrum asserts that Hall's methodologies—based on "common sense"—do not meet the standards for admission of an expert opinion. This issue, raised for the first time on appeal, should also be addressed on remand in determining the admissibility of Farm Bureau's evidence.

## 6. ATTORNEY FEES UNDER MCL 500.3148

Given our holding that evidence of third-party payments may be relevant, thereby requiring remand for additional proceedings, whether the trial court erred by denying Spectrum's motion for attorney fees under MCL 500.3148 need not be considered because an award of attorney fees at this juncture would be premature.[17]

## III. CONCLUSION

In Docket No. 347553, we reverse the judgment entered in favor of Spectrum regarding the balance on the charges billed by Spectrum for medical services rendered to Sabby. In Docket No. 348440, we reverse the order denying Spectrum's motion for attorney fees. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Having prevailed in Docket No. 347553, Farm Bureau may tax costs under MCR 7.219 relative to that particular appeal. We decline to award taxable costs in Docket No. 348440.

/s/ Jane E. Markey
/s/ Jonathan Tukel
/s/ Michael F. Gadola

---

[17] Although our ruling in favor of Farm Bureau with respect to the motion in limine lends some support to the denial of Spectrum's request for attorney fees, the issue of attorney fees cannot be properly addressed until, at the earliest, it is determined what specific evidence is admissible and the impact of the evidence on the question concerning the reasonableness of Farm Bureau's decision to only pay 80% of the amount billed. And, of course, the issue of liability is now reopened.